IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TASHANDA DAVIS, | ) | CASE NO. 1:13CV01556 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Tashanda Davis ("Plaintiff" or "Davis") challenges the final decision of Defendant, Carolyn M. Colvin, Acting Commissioner of Social Security ("Commissioner") denying her application for supplemental social security income ("SSI") under Title XVI of the Social Security Act . Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 15.

For the reasons stated below, the Commissioner's decision is **AFFIRMED**.

**I. Procedural History**

Davis filed her application for SSI on August 3, 2009, alleging a disability onset date of February 1, 2009.  Tr. 106, 145.  She alleged disability based on epilepsy, seizures, depression, panic attacks, and limited vision in right eye.  Tr. 138.  After denials by the state agency initially (Tr. 44, 54) and on reconsideration (Tr. 45, 64, 68), Davis requested a hearing (Tr. 71-73).  A hearing was held before Administrative Law Judge Suzanne A. Littlefield ("ALJ") on July 19, 2011.  Tr. 25-41.  In her October 27, 2011, decision (Tr. 8-24), the ALJ determined that Davis is

capable of performing past relevant work and is not disabled. Tr. 17-18. Davis requested review of the ALJ's decision by the Appeals Council and, on May 22, 2013, the Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal and Vocational Evidence

Davis was born in 1983 and was 28 years old on the date of the ALJ's decision. Tr. 106. Davis completed school through the 11th grade. Tr. 126. At the time of the administrative hearing, Davis had completed her GED coursework and was planning to take the GED test. Tr. 34-35.

### B. Pertinent Medical History[1]

Davis reported a history of seizures beginning in 2001 after the birth of her first child. Tr. 214. She reported in 2006 that she had been experiencing seizures every 1 to 2 months since 2001. Id. On July 23, 2006, Davis was taken by ambulance to University Hospitals of Cleveland. Id. The ambulance was called because Davis had two seizures at home. Id. Davis also had one seizure while in the ambulance. Id.

In January 2008, Davis first sought psychiatric treatment with Manjula Shah, M.D., at the Community Behavioral Health Center. Tr. 359. Dr. Shah initially diagnosed Davis with adjustment disorder, anxiety, depressed mood, and chronic panic attacks. Id. On June 9, 2008, Davis returned to Dr. Shah and reported that she was overwhelmed because of multiple stressors,

---

[1] Davis only challenges the ALJ's findings with respect to her mental health impairments. Accordingly, only the medical evidence relating to those claims is summarized herein. A quick background is given on Davis's seizure disorder, however, because the psychiatric treatment notes reference her seizure disorder.

2

health problems, racing thoughts, and she was experiencing panic attacks.  Tr. 349-350.  She also reported that clonazepam (Klonopin) was helping to reduce her anxiety and promote sleep.  Tr. 349.  On September 15, 2008, Davis reported "episodic high anxiety and distress because her Social Security ha[d] been denied."  Tr. 347.  She stated that she was experiencing financial hardship but was able to function with the support of her family.  Id.  She continued to report a benefit with the clonazepam.  Id.

On January 8, 2009, and April 29, 2009, Davis again reported benefit with the clonazepam which she stated helped her sleep better.  Tr. 345, 355.  She reported worrying about her health and financial problems.  Id.  On July 2, 2009, Davis continued to report that the clonazepam was helping.  Tr. 353.  Davis's diagnosis was changed to major depression, recurrent, moderate to severe, with episodic panic attacks.  Id.  Davis's treatment plan, which had been to continue with the clonazepam and return in 6-8 weeks, was not changed.  Tr. 354.  On August 10, 2009, Davis reported episodic high anxiety panic attacks and low frustration tolerance.  Tr. 365.  On September 10, 2009, Davis reported that she episodically experiences auras which make her feel dizzy and uncomfortable.  Tr. 363.  She stated that her anxiety is not in good control.  Tr. 363.  Dr. Shah noted that "[t]his could be related to aura, but she is not sure."  Id.  On October 15, 2009, Davis continued to report high anxiety panic attacks, low tolerance to frustration, depression, and at times " 'thoughts about life not worth living' but no plan."  Tr. 433.  Dr. Shah recommend Davis continue the clonazepam and start on Celexa.  Tr. 434.   The next two month Davis continued to report problems with high anxiety panic attacks and frustration.  Tr. 429, 431.  Dr. Shah recommended Davis continue the clonazepam and Celexa.  Tr. 430, 432.  Davis reported no side effects from the medications.  Id.  In February and

April 2010, Davis continued to report high anxiety and low frustration tolerance but was "doing better with Celexa and clonazepam." Tr. 427.

### C. Medical Opinion Evidence

#### 1. Davis's Treating Source

**Dr. Shah.** On April 10, 2008, Dr. Shah completed a mental functional capacity assessment for the Ohio Department of Job and Family Services on Davis's behalf in which he opined that she was extremely limited in her ability to complete a normal work day or workweek without interruption from psychologically based symptoms and to perform at a consistent pace. Tr. 272.  Dr. Shah further opined that Davis was markedly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and maintain regular attendance and punctuality; sustain an ordinary routine; make simple work-related decisions; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; set realistic goals or make independent plans.  Id.  Dr. Shah supported his opinion by stating that Davis is depressed and anxious following an accident where she sustained a facial injury. Tr. 273.  Dr. Shah noted that Davis's seizure disorder was not in a good condition but that she functions with the support and supervision of her family.  Id.  Additionally, he opined that Davis is "unemployable."  Id.

On November 17, 2008, Dr. Shah completed a mental status questionnaire on Davis's behalf. Tr. 340-42.  Dr. Shah opined that Davis had a poor ability to sustain concentration, persistence, and pace and a poor ability to react to the stress and pressures of work. Tr. 341. Dr. Shah also opined that Davis was limited in her social interaction.  Id.

4

On April 21, 2010, Dr. Shah completed a mental capacity mental source statement on Davis's behalf.  Tr. 421-22.  In that statement, Dr. Shah opined that Davis had a poor ability to maintain attention and concentration; maintain regular attendance; interact with supervisors; deal with work stress; complete a normal work day or workweek; understand, remember, and carry out detailed or complex job instructions; manage funds; or leave home on her own.  Id.  Dr. Shah also opined that Davis had a fair ability to socialize; behave in an emotionally stable manner; relate predictably in social situations; understand, remember, and carry out simple job instructions; work in coordination with others without distraction; function independently without special supervision; relate to co-workers; deal with the public; respond appropriately to changes in routine settings; or use judgment.  Id.

### 2. State Agency Opinions

**Dr. House.**  On June 3, 2008, David V. House, Ph.D., completed a psychological evaluation of Davis.  Tr. 306-311.  Dr. House diagnosed Davis with post-traumatic stress disorder and obsessive compulsive disorder.  Tr. 311.  He opined that Davis was mildly limited in her overall level of judgment, her concentration ability, and her ability to relate to the general public.  Id.  Dr. House noted that the "[p]rimary issue with her restrictions in interacting with the public is her physical condition."  Id.  Dr. House also opined that Davis was moderately limited in her adaptability and ability to withstand stress and pressure.  Id.

**Dr. Rivera.**  On December 23, 2009, state agency psychologist Aracelis Rivera, Psy.D., completed a psychiatric review technique ("PRT") (Tr. 394-407) and a mental residual functional capacity assessment ("MRFC") (Tr. 408-410).  In the PRT, Dr. Rivera opined that Davis was moderately limited in her activities of daily living and her ability to maintain concentration, persistence, or pace.  Tr. 404.  Dr. Rivera further opined that Davis was mildly

5

limited in her social functioning.  Id.  In the MRFC, Dr. Rivera opined that Davis retained the capacity to perform simple, routine tasks in a work setting with infrequent changes, which is not fast-paced, and does not require strict production quotas.  Tr. 410.  Dr. Rivera gave weight to Dr. House's assessment.  Id.

**Dr. Finnerty.**  On May 18, 2010, Dr. Rivera's findings were affirmed upon reconsideration by state agency psychologist, Todd Finnerty, Psy.D.  Tr. 423.

### D. Testimonial Evidence

#### 1. Davis's Testimony

At the administrative hearing, Davis was represented by counsel and testified that she cannot work because of her seizure disorder.  Tr. 32.  She testified that she gets headaches, feels confused, and drained for a couple of days after a seizure.  Id.  Davis also testified that she gets migraines twice a week.  Tr. 32.  Davis testified that she receives psychiatric care from Dr. Shah for depression and panic attacks.  Tr. 35.  She stated that she has been experiencing attacks since 2002.  Tr. 36.  Davis testified that she did not receive treatment from Dr. Shah for a full year because she was pregnant at that time.  Tr. 36-37.  She stated that her psychiatric treatment, consisting of medication and counseling, has not helped.  Tr. 37.

Davis stated that she took the course work for the GED test and was planning on taking the GED.  Tr. 34.  Davis testified that she previously worked at Party City in 2002 in a stock inventory position.  Tr. 33.  She stated that she was employed in that position as a seasonal employee for two or three months.  Id.  She also testified that she worked for Sea World in 1999 from June to August as a cashier in the gift shop.  Tr. 33-34.

### 2.  Vocational Expert's Testimony

Vocational Expert Thomas Nimberger ("VE") testified at the hearing.  Tr. 38-40.  The VE testified regarding the exertional and skill level of Davis's past work as follows:  cashier (light, unskilled) and retail stocker (light, semi-skilled).  Tr. 39.  The ALJ asked the VE if a hypothetical individual who could perform work at all exertional ranges but who would need to avoid all ladders, ropes, and scaffolding; avoid all unprotected heights or dangerous machinery due to seizure precautions; and who would be unable to drive commercial vehicles due to seizure precautions, could perform Davis's past work.  Tr. 39-40.  The VE stated that the hypothetical individual could perform both the cashier and retail stocker jobs.

The ALJ then asked the VE if a hypothetical individual could still perform Davis's past work if the following limitations were added to the first hypothetical:  performance of routine tasks with few changes in routine, pace, or the tasks themselves and interaction with coworkers on a superficial basis without confrontational interactions.  Tr. 40.  The VE responded that the second hypothetical individual could perform both the cashier and retail stocker jobs.  Id.

The VE was also questioned by Davis's attorney.  Id.  Davis's attorney asked the VE if there would be any jobs for a hypothetical individual who would miss an average of two to three days a month unscheduled.  Id.  The VE replied, "It at first would be a red flag, and eventually would preclude all work."  Id.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

7

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also* Bowen v. Yuckert, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In her October 27, 2011, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since August 3, 2009, the application date. Tr. 13.

2. The claimant has the following severe impairments: seizure disorder, migraines, obesity, and adjustment disorder. Tr. 13.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[3] Tr. 13.

4. The claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations. Posturally, the claimant must avoid ladders, ropes, and scaffolds due to seizure precautions. Environmentally, the claimant must avoid unprotected heights and dangerous machinery due to seizure precautions. The claimant is precluded from driving commercial vehicles due to seizure precautions. Additionally the claimant is limited to routine tasks with few changes in routine, pace, or the tasks themselves. She can interact with coworkers on a superficial basis without confrontational interaction. Tr. 15.

5. The claimant is capable of performing past relevant work as a cashier and retail stocker. This work does not require the performance of work-related activities precluded by the claimant's RFC. Tr. 17.

6. The claimant has not been under a disability, as defined in the Social Security Act, since August 3, 2009, the date the claimant filed the application. Tr. 18.

---

C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[3] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

### V. Parties' Arguments

Plaintiff argues that the ALJ erred in assigning "less weight" to the opinion of Davis's treating psychologist Dr. Shah.  Doc. 16, pp. 11-15.  Plaintiff also argues that the ALJ erred in finding that she can perform her past relevant work because her past relevant work did not rise to a substantial gainful activity level.  Id. at pp. 15-18.   In response, the Commissioner argues that substantial evidence supports the ALJ's evaluation of the medical opinion evidence and the ALJ's finding that Davis could return to her past relevant work.  Doc. 17, pp. 11-19

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Secretary of Health and Human Services,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

#### A.  The ALJ gave appropriate weight to the opinion of Dr. Shah

Davis argues that the ALJ erred in determining that Dr. Shah's opinion is entitled to little weight.  Doc. 16, pp. 11-15.  On April 22, 2010, Dr. Shah filed out a mental capacity medical

source statement on Davis's behalf and opined that she had a fair[4] or poor[5] ability to function in all work-related capacities except for maintaining appearance which was rated as good.  Tr. 421-22.

Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2). Conversely, "[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); (citing Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *2 (July 2, 1996)).

Dr. Shah's 2010 opinion was expressed as checkmarks on a form without further explanation or clinical findings in support. Tr. 421-22.  Dr. Shah's only comment was that Davis functions at home with the support of others due to her health-related problems, depression, anxiety, and panic attacks.  Tr. 422.  An ALJ is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation. *Buxton v. Halter,* 246 F.3d 762, 773 (6th Cir.2001); *King v. Heckler,* 742 F.2d 968, 973 (6th Cir.1984)). As discussed further below, Dr. Shah's opinion is conclusory and not supported by objective criteria or his treatment notes.  As such, it was proper for the ALJ to conclude that his opinion was lacking supportability and consistency.

---

[4] Fair is defined on the form as "Ability to function in this area is moderately limited but not precluded.  May need special consideration or attention."  Tr. 421.

[5] Poor is defined on the form as "Ability to function is significantly limited."  Id.

11

When the treating physician's opinion is not given controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, 20 C.F.R. § 404.1527(c)(2)-(6). Although the regulations instruct an ALJ to consider these factors, they expressly require only that the ALJ's decision include "good reasons ... for the weight ... give[n] [to the] treating source's opinion"—not an exhaustive factor-by-factor analysis.  *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2).  Good reasons "must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406–407; Soc. Sec. Rul. 96–2p.

The ALJ provided "good reasons" for giving "less weight" to the 2010 opinion[6] of Dr. Shah, which are  supported by substantial evidence in the record.   Specifically, the ALJ stated that Dr. Shah's opinion was entitled to "less weight…in light of [Davis's] ability to work towards a GED, take care of her young children albeit with the assistance of her mother or boyfriend who visit her, and maintain compliance with her medications and treatment despite her various physical and mental symptoms." Tr. 17.  The ALJ also discussed Davis's treatment history with Dr. Shah and concluded that, although Davis often alleged feeling overwhelmed, she was able to continue to take care of her children, household chores, her personal hygiene, and she was able to remain compliant with her medication which was reducing her anxiety and

---

[6] Plaintiff also points out that the ALJ only discussed Dr. Shah's 2010 opinion and failed to mention Dr. Shah's April 2008 and November 2008 opinions.  Doc. 16, pp. 12-13.  Not only are Dr. Shah's 2008 opinions prior to the alleged disability onset date but they provide a substantially similar assessment to Dr. Shah's 2010 opinion.  Tr. 272-273, 310-342.  Accordingly, the ALJ did not err by failing to discuss those opinions, which predated Davis's alleged onset disability date.

12

promoting sleep. Tr. 16. Furthermore, the ALJ found that Dr. Shah's determination that Davis had increased anxiety from her frequent auras was not supported by the records from Davis's neurologist. Id.

Dr. Shah's treatment notes are inconsistent with the severe limitations noted in his opinion. As the ALJ noted, Davis continuously reported to Dr. Shah that her medication was decreasing her anxiety and helping her sleep. Tr. 345, 347, 353, 355, 427. Although Dr. Shah changed Davis's diagnosis in July 2009 from adjustment disorder to major depression, recurrent, the record does not indicate the reason for the change. Tr. 353. At that point, the treatment notes had been consistent regarding Davis's complaints and her treatment plan did not change before or after the change in diagnosis. Id. As the ALJ stated, the only notable difference reflected in the treatment notes during the time her diagnosis was modified was that Davis was stressed after being denied disability. Id., Tr. 16.

Davis points out that Dr. Shah continually assigned her a GAF score of 50,[7] a score that indicates serious psychological symptoms. Doc. 16, p. 13. The Commissioner responds that "[i]t has been the Commissioner's longstanding position that the GAF scale does not have a direct correlation to the severity requirements in the Commissioner's mental disorders listings and is never dispositive of the disability determination." Doc. 17, p. 16 (citing Gilroy v. Astrue, 351 F. App'x 714, 715-16 (3d Cir. 2009). The Commissioner also notes that:

> [T]he latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) no longer includes the GAF scale. See, e.g. *Finley v. Colvin,* No. 12-7908, 2013 WL 6384355, at *23 n.9 (S.D.W.V. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool."). "'It was

---

[7] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.*

>recommended that the GAF be dropped from the DSM-5 for several reasons, including its conceptual lack of clarity . . . questionable psychometrics in routine practice.'" *Brown v. Colvin*, No. 12-513, 2013 WL 6039018, at *7 n.3 (E.D. Wash. Nov. 14, 2013) (quoting DSM 16 (5th ed., 2013)). Moreover, a GAF score reflected an individual's functioning at a particular moment in time; one score was generally not helpful in determining whether Plaintiff's alleged impairment lasted at least 12 months, as is required to be considered disabled. See 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 416.905(a).

Id. at pp. 16-17. As noted by the Commissioner, Dr. Shah's repetition of the same GAF score shows the highly subjective nature of the GAF determination because it failed to reflect the changes in Davis's condition over a multi-year period during which Dr. Shah's treatment notes showed improvement in her condition with medication and a change in diagnosis. Thus, the ALJ appropriately did not find the GAF dispositive of the disability determination.[8]

Dr. Shah's opinion was also inconsistent with the medical opinions of Dr. House, Dr. Rivera, and Dr. Finnerty.[9] The ALJ gave partial weight to the assessment of Dr. House but found that Davis had greater limitations in concentration, persistence, or pace since the time of Dr. House's assessment. Tr. 17. Dr. House opined that Davis was moderately limited in her adaptability and ability to withstand stress and pressure. Tr. 311. The ALJ did not state what weight he gave to the opinions of state agency consultants Drs. Rivera and Finnerty but noted that he considered their assessments when weighing the other medical evidence. Id. Dr. Rivera opined that Davis retained the capacity to perform simple, routine tasks in a work setting with

---

[8] "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted). "This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* at 773 (citations omitted). Judicial review is limited to "whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied." *Elam ex rel. Golay v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir.2003); *Castello v.Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610590 (N.D. Ohio Jan. 10, 2011) *report and recommendation adopted sub nom. Castello ex rel. Castello v. Comm'r of Soc. Sec.*, 5:09 CV 2569, 2011 WL 610138 (N.D. Ohio Feb. 10, 2011).

[9] The opinions of state agency psychologists are entitled to consideration under the same regulations used to assess other medical opinions, and may in some circumstances be entitled to greater weight than the opinions of treating or examining sources. 20 C.F.R. §416.927(e); SSR 96-6p; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 651 (6th Cir. 2006) (en banc) (affirming ALJ's decision adopting reviewing physician's opinion over treating physician's opinion).

infrequent changes, which is not fast-paced, and which does not require strict production quotas. Tr. 410.  Dr. Finnerty affirmed the findings of Dr. Rivera.  Tr. 423.  In the RFC, the ALJ adopted limitations similar to those assessed by Drs. Rivera and Finnerty, finding that Davis should be limited to routine tasks with infrequent changes "in routine pace or tasks themselves."  Tr. 15.

Further, the ALJ also determined that Davis's daily activities belie the severity of the limitations imposed by Dr. Shah.  The ALJ found Davis only mildly restricted in her activities of daily living.  The ALJ noted that Davis had no problems with personal hygiene, cleaning, doing laundry, cooking, and managing her finances with her mother's help.  Tr. 14.  Davis also reportedly cares for her three children whom she raises on her own with help from her mother and boyfriend.  Id.  The ALJ further noted that Davis had attended classes in order to complete her GED.  Id.  The ALJ's assessment is supported by the function report filled out by Davis herself in which she stated that she had no problems with her personal care, she completes household chores, takes care of her children, handles her finances, and gets outside everyday with help because of her seizures.  Tr. 184-188.

Based on all of the above, substantial evidence supports the ALJ's finding that Dr. Shah's opinion was not entitled to controlling weight and the ALJ provided good reasons for giving "less weight" to the opinion which was "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

**_Gayheart_.**  Finally, Davis argues that the ALJ's decision to give less weight to Dr. Shah conflicts with the Sixth Circuit's decision in *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375-76 (6th Cir. 2013).   In *Gayheart,* the Court held in relevant part that, in evaluating medical source evidence and opinions, an ALJ commits reversible error by subjecting the opinions of the

15

claimant's treating physicians to closer scrutiny than the opinions of the state agency physicians. *Id.* at 380. In that case, the Court observed that the ALJ rejected the opinions of the plaintiff's treating physicians for alleged internal inconsistencies and for being inconsistent with the record as a whole while at the same time accepting the opinions of the state agency physicians that suffered from the same flaws. *Id.*

The Court concludes, however, that *Gayheart* does not apply to this case because the record does not reflect that the ALJ scrutinized the opinions of Davis's treating physician more closely than the opinions of the state agency consultants or applied a double standard in her evaluation of medical evidence. *Hackle v. Colvin*, 1:12-CV-145, 2013 WL 1412189 (S.D. Ohio Apr. 8, 2013). Consequently, the Court does not find that the ALJ's evaluation of the medical evidence is contrary to *Gayheart.*

### B. Substantial evidence supports the ALJ's finding that Davis's former employment constituted past relevant work

The ALJ found that Davis could return to her past relevant work as a cashier or retail stocker. Tr. 17-18. To qualify as past relevant work, the work must have been performed in the last 15 years, have been performed long enough for the claimant to have learned to do it, and qualify as "substantial gainful activity" ("SGA"). 20 C.F.R. § 404.1560(b)(1), Tr. 18. Davis argues that the ALJ erred by finding that her employment as a cashier and retail stocker was past relevant work because it did not rise to SGA level. Doc. 16, p. 15.

Under the regulations, SGA is "work activity that is both substantial and gainful." 20 C.F.R. 404.1572. Substantial work is "activity that involves doing a significant physical or mental process." 20 C.F.R. § 404.1572(a). Work can be substantial if it is done on a part-time or seasonal basis. *Id.* Gainful work is "work activity that you do for pay or profit." 20 C.F.R. § 404.1572(b). The regulations provide that "generally," earnings are the primary factor in

16

determining if work constitutes SGA. 20 C.F.R. § 404.1574. A claimant who earns more than a specific amount prescribed by the guidelines set forth in the regulations is presumed to have engaged in SGA. 20 C.F.R. § 404.1574(b)(2)(ii)(B); *Tyra v. Sec'y of Health & Human Servs.,* 896 F.2d 1024, 1029 (6th Cir.1990). The claimant bears the burden of showing he was not engaged in SGA. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (finding that it is plaintiff's "burden to rebut" the presumption in order to prevail). A claimant may rebut this presumption of SGA "by evidence of the nature of the applicant's work, the conditions of employment and the adequacy of the applicant's performance." *Dinkel v. Sec'y of Health & Human Servs.,* 910 F.2d 315, 319 (6th Cir.1990) (citing 20 C.F.R. § 404.1573). For the time periods relevant to this case, the amounts necessary to create the SGA presumption are as follows: $780 per month in 2002,[10] $500 for June 1999, and $700 a month in July and August 1999. *See* 20 C.F.R. § 404.1574(b)(2)(ii)(B).

When testifying about Davis's past relevant work, the VE referred to Exhibit 5E, Davis's disability application. Tr. 39, 139. In her application, Davis indicated that her past work as a stocker for a "party shop" was performed during a one-month period in June 2002.[11] Tr. 122, 139. Davis further indicated that she earned $6.50/hour and worked 8 hours a day for 5 days a week at that position. Id. Assuming Davis worked 4 weeks in June 2002, she would have earned $1,040 for that month.[12] Davis also filled out a Work History Assistant Tool ("WHAT"),

---

[10] http://www.ssa.gov/oact/cola/sga.html (last visited 8/13/14)

[11] This information conflicts with Davis's testimony that she worked for Party City for two to three months. Tr. 33. However, "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion." *Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir.2001) (citation omitted).

[12] To determine the amount of $1,040 a month, calculations were undertaken as follows:

$6.50/hour x 8 hours a day = $52 a day

$52/day x 5 days a week = $260/week

17

in which she indicated that her work for Party City Incorporated in 2002 amounted to $1,007.46. Tr. 108, 111.   In June 2002, the amount necessary to create a presumption for SGA purposes was $780 a month.  Further, in her WHAT, Davis lists 6 prior jobs and includes the amount earned for each job.  Tr. 108.  For 3 of the 6 jobs listed, Davis states "Under monthly SGA amount" next to the amount earned.  Id.  For the Party City position, Davis does not include the "Under monthly SGA amount" language.  Id. Based on all of the above, it was proper for the ALJ to presume that Davis's job as a stocker constituted past relevant work and the ALJ's determination is supported by substantial evidence, i.e., testimony of the VE, Davis's application, and Davis's WHAT.

Because we hold that substantial evidence supported the determination that Davis retained the RFC to perform her past relevant work as a stocker, we need not address Davis's additional argument that her employment at Sea World did not constitute past relevant work.[13] See 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) ("if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled."); *See e.g., Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387,

---

$260/week x 4 weeks in a month = $1,040/month

[13] It should be noted, however, that the following could constitute substantial evidence that Davis's Sea World employment also amounted to "past relevant work."  The WHAT indicates that Davis earned $929.81 while employed at Sea World and, like the stocker position, the Sea World position is not one of the 3 positions that Davis specifically stated were "[u]nder the SGA amount."  Tr. 108, 111.  Accordingly, it can be assumed, based on the WHAT, that Davis's Sea World job was over the monthly SGA amount.  Unlike the stocker position, however, Davis's application does not list how long Davis worked for Sea World.  Tr. 139.  Instead, she lumps several "sales clerk" seasonal jobs together from 1996 through 2002.  Id.  The application does, however, state that the stocker job, which she performed for one month, was the longest job she has held.  Tr. 138-39.  Based on the information contained in the application, it would have been proper for the ALJ to determine that the $929.81 Davis earned from Sea World was earned during a period of less than one month which would make the $929.81 over the monthly SGA amount.  There is other evidence in the record including Davis's testimony that she worked for Sea World from June through August and reported amounts in the application for the sales clerk jobs that conflicts with the evidence mentioned above.  Tr. 34, 139.

392 (6th Cir. 2004) (finding that the ALJ's determination that plaintiff could perform one past relevant job was sufficient to conclude that he was not disabled).

## VII.  Conclusion

For the reasons set forth herein, the Court **AFFIRMS** the Commissioner's decision.

Dated:  August 21,  2014

Kathleen B. Burke
United States Magistrate Judge